STATE of Missouri,
Plaintiff–Respondent,

v.

Ronald DEE, Defendant–Appellant.

No. 53104.

Missouri Court of Appeals,
Eastern District,
Division Three.

May 31, 1988.

Irene Jeanette Smith, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

KELLY, Judge.

Ronald Dee appeals from the judgment entered after a jury's finding him guilty on two counts of sodomy and three counts of forcible rape. The trial court sentenced him to a term of imprisonment of fifteen years on count one for forcible rape; a consecutive period of fifteen years on count two for sodomy; a period of eight years on counts three and four for rape, concurrent to count one; and a period of eight years on count five for sodomy to run consecutive with count four for a total of thirty years' imprisonment.

Appellant raises three points on appeal. He attacks the evidence as insufficient to support his conviction, the testimony of two witnesses as irrelevant and designed to show appellant's propensity to make sexual advances toward his clients, and the admission of a tape-recorded confession as violative of his right to counsel and also as lacking a proper foundation and a valid chain of custody. Finding none of these to have merit, we affirm the judgment of the trial court.

Appellant's first point challenges the sufficiency of the evidence to sustain

his convictions. Our inquiry is limited to whether the evidence viewed in the light most favorable to the state is sufficient to support the verdict. *State v. Story,* 646 S.W.2d 68, 72[4] (Mo. banc 1983). In assessing the sufficiency of the evidence, therefore, we must accept as true the evidence and inferences that tend to support the verdict; we disregard all evidence and inferences to the contrary. *Id.* This includes any evidence offered by the appellant inconsistent with evidence offered by the state. *State v. Murphy,* 739 S.W.2d 565, 567 (Mo.App.1987). Our review is limited to determining whether there was sufficient evidence from which reasonable persons could have found appellant guilty. *State v. Jones,* 738 S.W.2d 513 (Mo.App. 1987). Further, uncorroborated testimony of a rape victim will ordinarily sustain a rape conviction. *State v. Fogle,* 743 S.W.2d 468, 469–70[4] (Mo.App.1987).

Viewed in the light most favorable to the verdict, the evidence established the following account.

During dissolution proceedings between V.B. and B.B. initiated in 1983, evidence surfaced of his sexual abuse of two-year old C.B., one of V.B.'s children. V.B. called the abuse hotline on September 15, 1984, to report the child abuse. Division of Family Services ("DFS") placed the child under its protective custody and entrusted V.B. with continued physical custody of her daughter. In November 1984, DFS assigned appellant to be V.B.'s caseworker. Appellant's duties included regular visits to her home to monitor the situation.

At about ten or eleven o'clock on the morning of October 29, 1985, after V.B. had returned from taking her children to daycare, appellant arrived at her house. He had scheduled the meeting with her to process some paperwork in connection with her children's attendance at the daycare center.

When he arrived, she was in the children's bedroom weatherproofing the windows. He watched her briefly from the bedroom door. As she finished her task and was turning around, he grabbed her arm and turned her around. She asked him to leave her alone. He then backed her against the wall, unbuttoned her clothes and pushed her down to the floor. She testified that he had hold of her left side and that she could not fight him off with her right side because of a mild stroke she had suffered. He told her that the decision whether her children would remain in her custody or be transferred to her ex-husband depended on him and that she should cooperate if she wanted to maintain custody of them. He then took off her clothes and raped her. With his knees across her arms, he forced her to engage in fellatio. After dressing, he reminded her before he left that he would take her children away if she told anyone.

V.B. admitted she offered no physical resistance to appellant's sexual attack. She explained that a mild stroke had left her right side debilitated. She also took medication for seizures. She further testified that he was so much bigger and stronger than she and she feared he would strike her, although he never told her he would strike her.

On December 30, 1985, while her children were in daycare, appellant again raped her in her bedroom during another one of his visits to her home. Again, he did not strike her, but reiterated his threat that the custody of her children was in his hands. Frightened by the memory of the earlier rape, she offered no protest when appellant ordered her to go into the bedroom and disrobe. She did not struggle or cry out when appellant pushed her down on the bed and perpetrated the rape. He again reminded her to keep her mouth shut when he left.

Following the first two rapes, V.B. began making arrangements to move to St. Charles where she would be in a different district with a new caseworker. When she called him in February 1986 to inform him she was moving, he stopped by her home unannounced on February 28, 1986. He had also visited her two or three times a

month between December 30 and February 28 for routine home visits, each without any sexual incident.

On his visit of February 28, he asked to see the baby's room, which she had recently redecorated. Once in the room, he ordered her to take off her clothes. After she disrobed, he again raped her. He straddled himself across her chest and forced her to orally sodomize him and then left.

She told no one of the sexual attacks. In early April 1986, she required hospitalization because she was suffering from seizures. She had seizures before the initial October 1985 attack; however, since then, the seizures had increased. The doctor attributed them to stress.

After leaving the hospital in April, she finally told her best friend Cathy Opfer of appellant's sexual attacks. Ms. Opfer had just recently returned to St. Louis from living in California and had moved in temporarily with her family to V.B.'s home. Ms. Opfer advised her to report the episodes immediately.

The following morning, V.B. telephoned the police. She spoke with Detective Reinhardt and told him that appellant intended to come by her home that day around three o'clock. Before appellant arrived, the detective and two other officers went to her home. Detective Reinhardt fitted V.B. with a body microphone. Then he hid in the closet of the children's bedroom; the other two officers waited outside in a car.

When appellant arrived, he sat first on the couch and then on a chair, closer to V.B. She told him she was leaving and that, before she left, she wanted to know why he had raped her and she wanted an apology. He replied that she knew the answer and the answer was in her mind. After she asked him numerous times to apologize, she then demanded a direct answer to the question why he had raped her in October 1985. He replied that if he had done it, forced her onto the floor and removed her pants and underwear, she had

enjoyed it and he did not consider that rape.

Their conversation was interrupted by the arrival of her friend Cathy Opfer. Ms. Opfer walked into the back bedroom where the detective told her the radio equipment was not transmitting. He sent her outside to tell the other officers to come into the apartment to back up his arrest. Appellant was arrested, taken outside the apartment, read his rights and transported to the police station.

Prior to any questioning, they gave appellant his *Miranda* rights. Appellant refused to initial the warning form acknowledging his rights, but stated that he did understand them. After about three hours of questioning, appellant agreed to give the police a statement which the officers taped. At the beginning of the taped interview, the officer asked appellant if he understood his rights generally and appellant stated he did. They did not review each one of the rights with him separately on the tape. During the taped interview, appellant admitted having sexual relations with V.B.

At trial, appellant denied that he had ever sexually molested V.B. Based on the foregoing evidence, the jury found appellant guilty as charged.

Appellant was convicted of three counts of forcible rape under § 566.030 RSMo 1986 and two counts of sodomy in violation of § 566.060 RSMo 1986. "A person commits the crime of forcible rape if he has sexual intercourse with another to whom he is not married without that person's consent *by the use of forcible compulsion.*" § 566.030.1 RSMo 1986 (emphasis ours). "A person commits the crime of sodomy if he has deviate sexual intercourse with another person to whom he is not married, without that person's consent *by the use of forcible compulsion.*" § 566.060.1 RSMo 1986 (emphasis ours). "Forcible compulsion" means either (a) physical force that overcomes reasonable resistance, or (b) a threat, express or implied, that places a person in reasonable fear of death, serious physical injury or

kidnapping of himself or another person. § 556.061(12) RSMo 1986. The gravamen of appellant's complaint is that no evidence of forcible compulsion exists to support his convictions.

■ The rule is well established in Missouri that one may be guilty of rape even though the woman offers no physical resistence if she submits through fear of personal violence. *State v. Koonce*, 731 S.W. 2d 431, 439 (Mo.App.1987). In *Koonce* we held evidence that defendant lifted victim off a stool and smashed her face into a bed, told her he was going to put her to sleep and then pushed her face into his penis sufficient to show that defendant had subjected victim to such force to overcome reasonable resistence. *Id.* [5].

In *Koonce*, a witness mentioned that the victim, an Army Reserve member, "looked like she could handle anything." We trenchantly observed that, although a woman may be a member of the Army Reserve, she need not use combat methods to resist to the utmost. *Id.* [6]. Resistance never comes into play where a threat (constructive force) is employed. *Id.*

■ Here, appellant pinned V.B. down as he raped her the first time. He kept a grip on her with one hand while he undressed her. She tried to pull away and told him to leave her alone. We believe that these actions, in conjunction with his threats implying his ability to take her children away from her, are sufficient evidence of forcible compulsion, both physical force that overcomes reasonable resistance and a threat of "kidnapping" of another person. That he had his knees across her arms when he forced her to sodomize him is sufficient evidence of forcible compulsion in connection with the October sodomy.

The second and third rapes, with the attendant act of sodomy on the third rape, were also accomplished by forcible compulsion. At the second rape, he pushed her down on the bed. With both the second and third rape, he reiterated his threat concerning the custody of her children. He straddled her to hold her down during the sodomy following the third rape. V.B. testified that the memory of the pain of the first incident filled her with fear with the second and third sexual episodes. We are satisfied that appellant's actions implied a threat of serious physical injury to satisfy the element of forcible compulsion for the rape of December and the rape and sodomy in February.

Appellant emphasizes that V.B. did not scream, bite or fend off appellant. It has been said that the law does not require or expect the utmost resistance to sexual assault when it appears that such resistance would be futile or would provoke more serious injury. *State v. R.D.G.*, 733 S.W.2d 824, 827 [3] (Mo.App.1987). In *R.D.G.*, the victim was the seventeen year old stepdaughter of her twenty-five year old assailant. The court held that, where the victim tried to stop defendant but was unsuccessful because defendant was "holding her arms tight", there was a sufficient showing of resistance, in the circumstances, to establish forcible compulsion. *Id.* [4]. This conclusion was reached despite testimony by victim, when asked if she screamed, that she did not do so because "[i]t wouldn't have done any good." *Id.* at 826. We believe *R.D.G.* to be persuasive authority for our conclusion that V.B. could reasonably have expected appellant to use such force as was necessary to accomplish his purpose, although he did not actually strike her. This force, coupled with his express threat that he would change her children's custody, satisfies the requisite element of forcible compulsion on all the charges. Appellant's first point is denied.

■ Appellant's second point contends the trial court erred in denying appellant's motion in limine seeking to exclude the testimony of Deborah Nahlik and Joyce Adail, two state's witnesses, on the grounds their testimony was offered solely to show appellant's propensity to make sexual advances toward his clients. The pretrial ruling on a motion in limine is interlocutory only and additional information pro-

duced at trial may prompt the trial court to alter its pretrial ruling and exclude the evidence. *State v. Evans,* 639 S.W.2d 820, 822 [1] (Mo.1982). An objection must be made at trial when the evidence is offered or the reference made, preferably outside the hearing of the jury, in order to preserve for appellate review the ruling made thereon. *Id.; State v. Muthofer,* 731 S.W.2d 504, 509 [4] (Mo.App.1987).

■ Appellant did not object when the state began its examination of Deborah Nahlik. Appellant did renew his pretrial motion that Joyce Adail's testimony be excluded prior to her testifying. Therefore, appellant's point concerning the admission of Deborah Nahlik's testimony is not preserved for appellate review. The issue of the admissibility of Joyce Adail's testimony is properly preserved. We briefly review the testimony of each.

Without objection by appellant, Mrs. Nahlik testified appellant had been her caseworker from October 1984 until March 1985. He visited her when her children were not home. Although he inquired about their well-being, most of his questions focused on her sex life. He asked about her sex life and if she liked sex. His questions frightened her. At their meetings they both sat on each end of her couch and he would move closer toward her on the couch, making her uncomfortable. Appellant told her she was a nice looking woman, informed her that if she would cooperate, things would go her way and if she did not, things would not go her way. He then asked her out for a drink, but she declined. She rebuffed his attempts to hug and kiss her. She later told her lawyer who reported the sexual harassment. Shortly after, a new caseworker was assigned to her. Absent timely objection, the issue of the propriety of the admission of Ms. Nahlik's testimony is not preserved for appellate review.

Joyce Adail testified she had been accused of abusing her son in 1985 and had been assigned appellant as her caseworker. Appellant visited her home over a two month period. Except on one occasion, her children were not present during his visits. He asked her out for a drink, which she declined. On one occasion he told her that "he could take a woman like [her] and [she] would melt like butter in his hand and stuff like that".

Appellant argues Adail's testimony was irrelevant and immaterial and introduced solely to demonstrate appellant's propensity to make sexual advances to his clients. Whether or not evidence is relevant "depends upon whether it tends to prove or disprove a fact in issue or to corroborate evidence which is relevant and which bears on the principal issue." *State v. Clark,* 711 S.W.2d 928, 932 [5] (Mo.App.1986). Appellant is correct that in Missouri the prosecution may show a defendant's propensity for illicit sexual relations with the prosecuting witness but similar sexual crimes with other persons are generally inadmissible for purpose of showing propensity. *See State v. Young,* 661 S.W.2d 637, 639 [6] (Mo.App.1983). This general rule, however, is subject to several exceptions. "Evidence of other crimes is admissible if the evidence tends to establish (a) motive, (b) intent, (c) absence of mistake or identity, (d) a common plan or scheme or (e) identity." *State v. Muthofer,* 731 S.W.2d at 508 [1].

The evidence offered by the state here is admissible to show appellant's common plan or scheme to use his position as a caseworker to obtain sexual gratification. In *State v. Koster,* 684 S.W.2d 488 (Mo. App.1984), we held to be admissible the testimony of three witnesses that defendant initiated sexual encounters in exchange for special privileges while they were detained at a juvenile center where defendant was employed as a house parent. *Id.* at 490–91 [1, 4]. Similarly, all of the sexual encounters here resulted from a common scheme or plan by appellant where, given his authority as a social caseworker in determining their continued custody of their children, he exercised his control over these women and made them "the target of his

sexual excesses." *Id.* at 490. The evidence of both witnesses was clearly relevant. This point is denied.

Appellant's final point claims the trial court erred in denying his motion to suppress state's exhibit two, a tape-recorded statement which appellant agreed to make at the police station after being advised of his *Miranda* rights. The tape apparently contained statements by appellant admitting, despite his earlier denials, that sexual contact had occurred between V.B. and him but that such contact was consensual. Neither the tape nor a transcript of its contents appears in the record on appeal. Appellant claims the tape was improperly admitted into evidence over his objections that it had been obtained in violation of his right to counsel and that the state had failed to lay a proper foundation and to establish a chain of custody.

In arguing that a proper foundation was not laid for the admission of the tape, appellant relies on *State v. Spica*, 389 S.W.2d 35, 43–46 (Mo.1965), *cert. denied* 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966). Appellant's reliance on *Spica* is misplaced. We observed in *State v. Molitor*, 729 S.W. 2d 551, 555 (Mo.App.1987), that the *Spica* court was addressing the propriety of admitting a criminal defendant's taped conversation which was taped without his knowledge. Here, during the course of the trial and at the hearing on the motion to suppress the tape, appellant admitted he made the tape-recorded statement. No issue exists, as did in *Spica*, that the tape was made without his knowledge. We find this situation distinguishable from that in *Spica*.

The real thrust of appellant's complaint here, as in *Molitor*, is not against the admission of the tape itself; rather, it is against the admission of the contents of appellant's recorded statement. Appellant's argument is that the statement was involuntary because it was obtained in violation of his right to counsel. Appellant testified he had requested an attorney three or four times during his three hour interrogation prior to making the taped statement.

The only evidence to support appellant's assertion is his own testimony. The police officers testified that they did not coerce appellant to make the statement and that appellant had requested to speak with his boss, not with an attorney. The trial court heard the tape and the testimony of all the witnesses involved.

In reviewing the trial court's determination on the motion to suppress, the weight of the evidence and the credibility of witnesses are for the trial court's resolution. *State v. Boggs*, 634 S.W.2d 447, 453 [4] (Mo. banc 1982); *State v. Jones*, 747 S.W. 2d 229, 234 [6] (Mo.App.1988). In this vein, as an appellate court, we are not confined to appellant's version of the facts; we are to affirm if the judgment is supported by substantial evidence. *Boggs*, 634 S.W.2d at 453 [5]. We find substantial evidence supports the trial court's determination that the tape-recorded statement was voluntary.

■ Appellant's final volley against the use of the tape-recorded statement attacks the state's failure to establish a chain of custody of the tape. As we recently observed, the prevailing law in Missouri is that one must provide "reasonable assurance" that the exhibit sought to be introduced is in the same and in like condition as when received. *State v. Fels*, 741 S.W.2d 855, 857 [2] (Mo.App.1987). The state is not required to account for the hand-to-hand custody of evidence under the reasonable assurance standard nor is it required to exclude every possibility that the evidence has been disturbed. *Id.* When an exhibit has been positively identified, the chain of custody of the evidence becomes irrelevant. *Id.*

Detective Reinhardt identified the tape as the one used to record the statement appellant made the night he was arrested. The detective testified he marked the tape with his department service number and put the tape in the evidence bag. The tape was kept in the evidence bag in the police

department's possession or in the prosecutor's office. The detective further testified no changes had been made since the tape was originally recorded. The record clearly dispels any purported problems in the chain of custody of the tape. All of appellant's complaints against the admission of his tape-recorded statement lack merit. Point denied.

Accordingly, we affirm the judgment of the trial court.

KAROHL, P.J., and SMITH, J., concur.